UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| KELLY MALONE, § | |
| § | |
| Plaintiff, § | |
| *versus* § | CIVIL ACTION H-04-3232 |
| § | |
| § | |
| TEXAS DEPARTMENT OF HUMAN SERVICES, § | |
| § | |
| Defendant. § | |

# Opinion on Summary Judgment

1.  *Introduction.*

Kelly Malone sued her former employer. She claims that her supervisor discriminated against her. The employer has moved for summary judgment and will prevail.

2.  *Background.*

From October 23, 2000, to May 9, 2003, Malone worked at the Texas Department of Human Services. Malone is a white female. She processed Medicaid applications. On August 1, 2002, Nogieru "Sonnie" Ogiamien became her supervisor. He is Nigerian.

Malone has a partial disability. She frequently went to the hospital during the time that she worked at the agency. Ogiamien tried to require her to ask for time off for her appointments in advance. She rarely did, but he usually allowed her to leave.

The agency required her to complete a minimum number of applications each day. She fell behind. She complained to Ogiamien's supervisor about his "attitude." Ogiamien counseled her for falling behind and for keeping her desk in what she described as "an organized mess." He made her fix her mistakes and do her work. They bickered about how she was to do her job.

He socialized with her Nigerian co-workers. He gave her and her co-workers extra holiday leave, but her co-workers – who traveled internationally that year – had only to

ask once while she had to ask three times before she got it. He made her communicate with him through her immediate supervisor instead of directly to him.

In March 2003, she told the agency that she was disabled. She asked it to accommodate her disability by allowing her to do less work on the days when she had doctor appointments. The agency required her to sign its medical information release form before it would consider her request. It did not reduce her workload because she refused to sign the release.

Immediately before resigning, she filed an internal civil rights complaint. She claimed that the agency discriminating against her on the basis of her disability by denying her accommodation and that Ogiamien mistreated her on the basis of her race. She also claimed that he retaliated against her for complaining about him.

Malone now sues for disability, race, national origin, and sex discrimination. She also argues for relief for retaliation and infliction of emotional distress. The agency has moved for summary judgment.

3.   *Disability*.

Without knowledge of her disability, the agency could make no reasonable adjustments for her. Malone claims that she told the agency about her disability when she applied in 2000. The record shows that Malone gave the agency no medical evidence of her disability even when she asked for accommodation on the basis of it in 2003.

Even if it had known of her disability, it was not required to reduce her workload. Regardless of the form of accommodation that she wanted or required, the agency had no obligation to make changes for her that would have altered the essential functions of her position. Managing a set number of cases was a fundamental requirement of her job – allowing her to do fewer would have fundamentally changed her responsibilities and reduced the agency's ability to function. Reducing its ability to function is an undue hardship that the agency need not have accepted.

Further, none of her complaints – except her annoyance at being required to ask for time off in advance and not being allowed to do less work on the days that she got time off – are related to her disability. She explains that she finished fewer cases than her

co-workers because she was more thorough. If that were true, her request to do less than the minimum number of required cases was because of her work style, not her disability.

4.   *Race and National-Origin.*

Ogiamien did not discriminate against her on the basis of her race or national origin. He was inept. He had no consistent workload distribution, leave, vacation, or counseling policies. Many of his employees regularly failed to meet deadlines, erred, and missed work. He manipulated his case tracking system to disguise their poor performance by taking them "off the schedule" to allow them to catch up. He took all of his employees off the schedule, including Malone. Many of her co-workers caught up, but she did not. Her failure to catch up does not equate to discrimination by Ogiamien.

He was friendlier with his Nigerian employees than with her, but he and Malone disliked each other. He socialized with the Nigerians at work and on the weekends. When Ogiamien and Malone interacted at work, they were only marginally civil. Their mutual incivility, however, does not show intolerable abuse by the agency.

Malone cannot show that he counseled her more than his employees of other races and national origins. The agency records show that, of the nine employees that he had counseled, three were African-American, two were Asian, two were white, and one was Hispanic. He counseled employees of all races, not just whites and not just Malone.

Malone shared her dissatisfaction with his supervision with her diverse co-workers. The agency's investigator found that although Ogiamien was nicer to his female Nigerian employees than his other employees, he was an indiscriminately poor manager whose incompetence affected everyone he supervised. He wrote that Ogiamien should consider improving many aspects of his performance. However, Ogiamien's incompetence alone does not amount to an adverse employment action. Malone has no other evidence of racial animus or national origin discrimination; she has no claim.

5.   *Sex.*

Malone has no sex discrimination claim. She must show that, despite her qualifications, the agency adversely acted against her on the job and replaced her with a male. She has no evidence that it did.

Malone claims that Ogiamien forced her to correct her male co-workers' mistakes. If they existed, she relied on earlier cases in the applicant's record to assess the applications that she processed. When she found mistakes in an earlier one, she wanted Ogiamien to make the employee who worked on it fix it before she would finish her application.

Although he did it once, he made fix the other old mistakes as she processed the new applications. He made her do her job. Her job was to process the current application, regardless of the existence or condition of previous applications. Requiring an employee to complete the less desirable tasks of her job is not an adverse employment action. *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997).

When Malone thought that Ogiamien unfairly praised one of her male co-workers, she searched for mistakes in five of his recently completed files. She demanded that Ogiamien make him fix them. Instead, he made Malone do it. She volunteered to take on the additional responsibility when she critiqued her co-worker's performance. She cannot show that Ogiamien and the agency took away her responsibilities and gave them to a male worker.

Malone cannot show that she was in a hostile work environment. Ogiamien was nicer to Nigerian female employees than to her, but he was not required to be as nice to her as he was to them. She cannot claim he discriminated against her on the basis of her sex because of his treatment of her fellow female employees.

6.   *Constructive Discharge.*

Malone claims that the working conditions imposed on her by Ogiamien forced her to resign. To claim a constructive discharge, she must show that he intentionally harassed or humiliated her on a statutorily-protected basis to an extent that would have compelled a reasonable person to quit. *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000).

Malone has the burden of proving that she was constructively discharged. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005). She must present enough evidence to create a question of material fact about whether the agency treated her in a way that would have compelled a reasonable person in her situation to resign. She has

- 4 -

not – she cannot show that she was demoted; paid less; deprived of responsibilities; assigned to degrading tasks; or badgered or humiliated in a way calculated to force her to quit. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

Malone claims that the stress Ogiamien created for her made her quit. She has no evidence that his actions would have made a reasonable person quit. He allowed her to speak to him about policy issues, go to doctor appointments, and take extra vacation days. It is unreasonable to believe that his penchant for office favorites, initial rejection of her leave request, and single counseling created an intolerably abusive work environment for her.

She also claims that she had to quit because her stress level might aggravate her disability. The agency learned of her disability shortly before she quit. It could not have known that it made her sensitive. She refused to release her medical records. Without knowledge of her disability, it could not have used it to make her quit.

Malone was not constructively discharged. She cannot link Ogiamien's difficult behavior to her disability, race, national origin, or sex. She cannot say that the agency forced her to quit. She has a general complaint about workplace fairness.

7.   *Retaliation*.

Malone has no retaliation claim. To claim retaliation, she must show that she participated in a protected activity and her participation in that activity caused the agency to take an adverse employment action against her. She alleges that Ogiamien forced her to quit. He did not.

Malone claims that Ogiamien retaliated by mistreating her after she informally complained about "his attitude" to his supervisor. His actions after her complaint were not retaliatory. They were induced in part by her decision to query him about the facts in her cases more often than she had before she complained. *She* became more confrontational with him after her complaint.

In fact, he treated her better than before. He told her to speak with her immediate supervisor instead of directly to him when she had questions about her cases. He continued to allow her direct access to him for policy questions. He even praised her when she completed her work.

She claims that the "do not rehire" recommendation that he tried to give her during her exit interview was done in retaliation for her internal equal opportunity complaint; however, he changed it during the interview immediately after his supervisor told him that it was unsupported by her counseling record. She has no injury.

Treating Malone's first complaint as a protected activity, she suffered no adverse employment action from it. She has no evidence to create a material fact that the agency forced her to quit. Nobody did anything to her that was different or worse than before her complaint. Her subjective opinion that she was mistreated is insufficient to survive the summary judgment reasonable person standard.

8.  *Emotional Distress.*

Malone has no claim for emotional distress. She and Ogiamien did not get along well. He was a poor manager. She was a poor employee. They frustrated each other. Intentional infliction of emotional distress is the modern equivalent of assault. Her facts are about workplace friction and conflict – she does not claim to have been attacked without effect, which is the essence of assault. Her distress was self-inflicted.

9.  *Conclusion.*

The agency did not discriminate against Malone on the basis of her disability, race, national origin, or sex. It took no adverse action against her. It did not retaliate against her. It did not make her quit. It did not intentionally inflict emotional distress on her. Malone's claims have no basis in law or fact.

Signed March 21, 2006, at Houston, Texas.

_____
Lynn N. Hughes    USDJ
United States District Judge